Calendars, United States v. Akru and Okonjo-Wanji. We have Mr. Rubati going first. I see you reserved one minute for a vote. You can begin whenever you're ready. Thank you, Your Honor. May it please the court, my name is Michael Rubati and I represent the appellant Jabril Adamu. We've raised two primary issues on appeal, the Confrontation Clause issue, which I'd like to address first, and then the Castigar issue. Each of these issues independently warrant reversal and the Castigar issue also warrants dismissal of the indictment. Now I'd like to start with the Confrontation Clause issue because after we filed our opening brief in this case, the Supreme Court decided Smith v. Arizona. And we believe that an application of Smith here is a straightforward path to reversal. There are two factors for this court to examine under Smith. First, whether or not the extraction reports are testimonial. And second, whether or not they contain the analyst's hearsay statements. The first element is not in dispute here by the government. These reports were created for law enforcement and prosecutorial purposes. They are testimonial. The second element also should not be in serious dispute here. As we talked about in our reply brief, the SDNY analysts relayed numerous hearsay statements to the jury about the extraction process. And Mr. Adamu was entitled to cross-examine the underlying- But those were based upon things that the witness himself concluded from his own review of the report. The report itself, the person who generated the report, who was not available, it's essentially just a program, a computer program. Cellbrite is a computer program. You can correct me if I'm wrong. You hook up the phone to, and it extracts information and generates a report. Yes? Isn't that the way it works? It is correct, Your Honor, that it is a software that generates reports. However, as- So there was nothing that that witness, who was unavailable, who didn't testify, could have testified to other than, I hooked the phone up to this computer and pressed a button and ran this report. No, Your Honor, that's not correct. And at our reply brief at page 23, we detail numerous hearsay statements that the SDNY analyst actually testified about the process. For instance, he testified about the software that he used, the type of extractions that- When you say he used, I just want to be clear. You're saying what the Croatian national police officer- Yes, so the SDNY analyst testified about what the Croatian examiner said in his extraction reports that he did. He testified about the software that he said he used, about the profile he said he selected for each phone, about the type of extraction that he said he ran. All of these things are meat for cross-examination. Well, can I just ask? I mean, I get it. He probably would have been able to cross-examine the Croatian officer about whether he screwed up and hooking up the wires and all that. But that's not really the meat of your argument, right? The meat is just this report from the Croatian national police officer must have been offered for the truth. Otherwise, there was no basis for the American examiner's testimony, right? Because he said all of this stuff is based on- I looked at a report that has this IMEI, and that matches the IMEI I see on this phone, right? And if the Croatian national- if he didn't know that the Croatian national police officer said, I got this report off this IMEI, then everything else just falls out the window, right? That's correct, Your Honor. It's the same rationale as in Smith. Santos' testimony, the SDNY analyst, was entirely useless to the jury if everything in that report was not true. He testified about his own observations, what the district court said about- But you can tell from the report that the program produces, that a machine produces, that it is the phone. It's indicated in the report itself. What would the Croatian police officer add? Your Honor, the Supreme Court made clear, both in Volkaming and Melendez-Diaz, that even if this results from the most reliable process- Both of those cases had certifications where the witnesses were testifying to very specific things, whether they followed certain protocols in doing the tests. There was a lot more to what those laboratory tests were being offered for that you needed a live witness for. Neither of those cases involved what we have here, which is purely hooking a phone up and running a computer program. There's been no case- Actually, the government cites cases that go against you. The Hill case in the Fifth Circuit is exactly the situation, and they concluded that there's no confrontation cause problem. They cite other cases. The Ninth Circuit said satellite images, which are machine generated, don't create a confrontation cause problem. The Eleventh Circuit said cell phone call and billing records. The Seventh Circuit said address a raw drug test. That's more what we have here than either what we had in Volkaming and Melendez. But, Your Honor, it is about the protocol. It is about the process. We had a right to cross-examine this analyst about the process that he used. But the process was simply hooking up the phone to a machine that ran a computer program. Is it your contention that somehow the computer program, as it ran, generated incorrect information or information that would undermine what prima facie was on the report that was proper? Your Honor, I would urge the court to look at pages 22 and 23 of our reply brief. Remind me what you said. Which is where we talk about what the SCMY analyst says about this process in his testimony. There's a three-step process that has to be followed here. There's the acquisition phase where the analyst makes a whole bunch of determinations. He takes human actions in selecting within the program what type of extraction he's going to run, what type of profile the phone is, what type of equipment he is going to use. If he screwed all of that up, that is something that we got to cross-examine him about. If he lied about all of that, that is something that we got to cross-examine him about. It seems to me that we're sort of veering into a variant of harmless error analysis that I don't think actually applies to the Sixth Amendment Confrontation Clause. My understanding is that if something was offered, a testimonial statement was offered for the truth of the statement, it doesn't matter. You don't need to prove that you could have cross-examined the person so effectively as to undermine their testimony. I thought then our harmlessness analysis would just be like there was an error, it shouldn't have come in, and now we evaluate the rest of the evidence. Not if this thing was really not – if the true examiner could have been ripped to shreds, then you win. But if the true lab analyst and DNA or the actual Croatian extraction analyst could have been ripped apart, that's not the question here. Under your view. That's the question. It is about the right to cross-examine. So can I just back up to what I think would be the harmlessness analysis if you were correct? Then we're under Chapman v. California, right? That's correct. Because it would be a confrontation clause, constitutional error. The government bears the burden of showing harmlessness but the unreasonable doubt. How do you get around your client's confession? The combination of your client's post-arrest confession admitting that he knew who Cardona was, he knew he was a drug smuggler, he knew he had been asked by Cardona to arrange for planes to be purchased in the past. And he, Adamu, believed that Cardona was in Europe and he had been told that by Fofana. And then when you put that together with what I think is the unimpeachable video recording of Lange's meeting with Cardona in Rambo, in Togo, where Lange says, basically I'm paraphrasing here, but I have dirty pilots who do the bad business, not the cover business for the flights. One of them is Jabril. How do you get around that? I guess I'm not sure we even have to get to the confrontation clause issue here. I guess I don't see how he gets around that with his confession. Your Honor, I would say make a couple points here. First, it's the burden of the government to prove beyond a reasonable doubt that these text messages did not contribute to the verdict that was obtained. The jury sent out a note right before it reached the guilty verdict specifically asking for these text messages. And his confession. And the testimony of the agent who took his confession. He asked for both of those things. Simultaneously, right? And I think, Your Honor, that I don't read that confession as having the same weight that you do. All he says in that confession is that he knew Cardona Cardona, who is a world-renowned international drug trafficker, to be an international drug trafficker. But he knew and he believed him to be in Europe. So it's not like, oh, I read about the guy in the papers, right? He says Profana told me he's going to be in Europe. Not many people who have heard of a drug trafficker through the newspapers have been talking to a known conspirator who has told them, oh, and by the way, the guy is going to be in Europe. Simply because he knows – guilt by association is not proof beyond a reasonable doubt. I'm not saying by association. Simply because he knows that he's going to be in Europe doesn't make him guilty of this crime, right? It kind of corroborates Lange's co-conspirator statement that is clearly admissible to say Jabril is one of my dirty pilots. Well, Your Honor, about those undercover recordings, you know, Adamu is not at those meetings. There's one isolated comment off the comment by Lange that you've referenced there. But again, it is the burden of the government to show that these text messages did not contribute to the burden. I understand. Thank you. Do you have one minute for rebuttal with Mr. Edelstein? You're reserved two minutes for rebuttal. Good morning, Your Honors. May it please the Court. Jonathan Edelstein for Mr. Lange. I'd like to pick up on a couple of other aspects of the software part of the Confrontation Clause issue. And I'd like to point specifically to Mr. Santos' testimony that recited in the main brief and I believe in the reply brief as well, that the extraction process is subject to both human error and software error. And Mr. Santos gave certain opinions drawn from the data in the report about why he didn't think that software error or human error had occurred in this case. And I would submit that that is precisely what the Smith case forbids, is that he is vouching for the process conducted by the original analyst, that he is taking the data from this report and he is giving what purports to be an independent opinion that in fact puts the truth of that data and that report and the analyst process. Would the testimony be the same even if he had extracted the information from the phone itself? All the issues about whether the report somehow or the information shown on the report could be incomplete, manipulated, would all be the same even if he was the person who actually hooked up the phone and generated the report? It's the same testimony. He's basing those conclusions. He's not vouching for what the Croatian police officer did. He's looking at the report and the substance of the report and testifying as to why he believes from that that there were no issues, and his knowledge of the program itself. He used that program, he said, every day. So he's not basing it, he's not vouching for the officer. He's basing it upon his review of the report and his understanding, deep understanding of the computer program. Well, I would submit that's exactly what happened in the Smith case, that even if this Mr. Santos states that he's giving an independent opinion based on the data that was extracted by the Croatian analyst, that's still putting the truth of that data and the truth of that process before the jury. Basically, as your argument amounts to, we don't know that this is the data extracted by the Croatian analyst except for the fact that there's a report claiming that it is the data extracted by the Croatian analyst. Yes, correct. Did you put that at issue? Was that put at issue? Well, there was extensive cross-examination and colloquy in which the issue of error and the issue of the fallibility of this report was put before the district. Whether it was the same phone or not, that wasn't put at issue below. This is a different phone? The report's not for the phone? That was your client's phone? That wasn't the issue? No, but the accuracy – no, whether it was this particular phone was not put at issue. But certainly the accuracy of the data extracted was put at issue. And I would point out as well – Well, these are the two distinct issues we're talking about. The 901 authenticity is different from the Confrontation Clause issue, right? Yes, Your Honor. Am I understanding it right that analytically you could have really no meaningful challenge to the authenticity of evidence, but you would still have a Confrontation Clause challenge, right? Absolutely, absolutely, Judge. Certainly in the Volkermann case there was really no challenge to the authenticity of the gas chromatograph report. Nobody was saying these were different drugs that were analyzed. It's – so authenticity and confrontation are two different issues. You have a right to confrontation even if the report is indisputably authentic. So I'm out of time, Judge, so I'll reserve for rebuttal. Thank you, Judge Edelstein. We'll hear from the government. Ms. Tarlow? May it please the Court, Eleanor Tarlow for the United States. I represent the government on this appeal and in the district court proceedings below. I'd like to start where Your Honor's left off with the Confrontation Clause issue. The cell phone extractions here are printouts of electronic data. As Your Honor's noted, it was a matter of pressing a button to generate – Well, wait a minute. It's more than that, right? I thought it also included the expert's report, the analyst's report. It wasn't literally just a printout of the photos of the text, right? It also indicated how it was brought in the source, right? It's not just a printout of the data. I thought – It's a PDF report of a forensic image of the phone. Right, which includes not just the actual contents. It also includes information that your agent testified about, right? Like I'm comparing – I don't know what he said, but he said here – Were you able to tell where and by whom the extractions were performed? Yes. Can you tell us? Croatian National Police. Like that data was not from the phone, right? That data that was extracted by Croatian National Police was not because it was not the process.  So how do you know that? What were you able to see that gave you that information? Answer. Part of the report lists the person who conducted the examination. There's also a logo for the National Police of Croatia and all these other things. So this is not a case where we're simply looking at the data extracted from the phone. We're also looking at the report that includes information about the extraction performed by personnel in Croatia, right? Yes, Your Honor, but my understanding is the statements that are being argued as testimonial are not in fact testimonial. So, for example, with respect to the IMEI number that is listed on the report, that is not a testimonial statement by the Croatian individual who performed the extraction. So how do we know that that's a true statement that the extraction was linked to that IMEI? How do you know? How does anyone know except that a Croatian National Police officer said, I extracted it from that phone? My understanding is that the IMEI number on the report is machine generated. But how do we know it was machine generated off that phone? Because, Your Honor, Mr. Santos testified that in his experience, that is the common practice that when one conducts these extractions using Celebrate, the IMEI on the report reflects the IMEI on the phone. So he's saying that's what the guy must have done? Why wasn't he entitled to cross-examination on that point? Well, Your Honor, defense is entailed to cross-examine Mr. Santos about the operation of the Celebrate program, the deficiencies in the program, and the errors that might have occurred in general using that program. Mr. Santos can testify to his experience and explain why, in his experience, the IMEI number is generated using the Celebrate program. That cross-examination that they can conduct to Mr. Santos would go to the weight of the evidence that is presented, not to the admissibility, and it isn't a Confrontation Clause issue. Well, you don't know that until you know what the answers to the questions are. I mean, the issue is not the questions that you think are appropriate. The issue is whether the questions that the defense lawyer asks are appropriate. Yes, Your Honor, and defense counsel was entitled to ask those questions of Mr. Santos, who described that this was a machine-generated data point. If a Croatian police officer had testified, the only additional information that that officer could add beyond what Mr. Santos testified to is, I took the phone, I hooked it up to the computer, and I hit the Celebrate program. Yes, Your Honor. That would be it. That is our understanding. Just to go back to Judge Nardini's question, other than his name, who that officer was, and the symbol for the agency, in that report, are there any statements by that officer in the report that are not generated by the program itself? No, Your Honor. It's machine-generated data. This is probably water under the bridge, but I am just curious why you didn't call the Croatian analyst. If it's in the record. If it's not in the record and it's a problem, you don't have to answer that. I just don't know. Your Honor, I'm not entirely sure, but my understanding is that he wasn't available to come to the United States to testify, but I'm not sure the basis for that. If you have an unavailable witness that's overseas, you can take a deposition. You can preserve that. You can have something, an examination done of somebody overseas. You can even do it by video conference. You can have the defense lawyers participate. The video testimony can then be presented to the jury, right? That's a thing that happens, right? So it's not as though just because somebody's overseas and not available at the time of the trial, that somehow it can't be done, right? It's possibly, Your Honor. The government took the position at trial that it wasn't necessary for the reasons we're asserting here, and so we did not do that. Judge Gardefee did not abuse his discretion in determining that the evidence was admissible via. And what's the deal with not doing a second extraction? Is that because if you do it a second time with Cellbrite, it may be a little messed up because you've changed the security settings? Your Honor, metadata may be altered in the course of doing so. Can I ask you to turn to the question of whether we even need to reach this? I understand you've made a harmlessness argument. I think I get it pretty easily with respect to Lange. Adamu seems a little tricky, though, because as your adversary points out, the jury did ask, among other things, for all of the, I don't know, was the text messages or the messaging involving Mr. Adamu. How do you get around that to show that it was harmless beyond a reasonable doubt, assuming error? Yes, Your Honor. As Your Honor pointed out, it was in conjunction with a request also for his post-dress admission. In the light of the overwhelming evidence that was presented against Mr. Adamu, even if the evidence that was obtained from the phone was excised from the record, there would be more than sufficient evidence to prove beyond a reasonable doubt of his guilt. Not only Mr. Cardona's testimony, which described his prior interactions with Mr. Adamu, including attempts to conduct drug trafficking, the fact, as Your Honor noted, of the recorded meetings at which Mr. Lange described Mr. Adamu's role in flying the plane in the past to carry out drug shipments, and after the fact that Mr. Adamu was on a plane with Mr. Lange with one kilogram of cocaine to carry out the test shipment. And so I take Your Honor's point that there was a jury note that discussed and asked for it, but in light of the overwhelming evidence against him, and because it does not appear that their decision necessarily rested on that evidence, we believe that there was no harmless error here. And can I just make sure that I'm thinking about the harmlessness analysis in the right framework? My understanding is that if we were to decide there was a confrontation clause issue, what we have to do is excise the offending testimony from the trial and then determine what the rest of the evidence would have yielded, right? We don't ask what the effect would have been had there been cross-examination of this witness who wasn't presented, right? I mean, I don't think I've ever seen a case that operated that way, that we basically add in a hypothetical cross-examination. What we do is we extract the struck testimony. But if I'm getting it wrong or there's some cases suggesting that we do hypothesize what the cross might have been, tell me that. Well, I'm looking at United States v. Lee, which is the Second Circuit 2008 opinion. It says a violation is harmless if upon a review of the entire record, this court is satisfied beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. And here, Your Honor, we would submit that it did not in light of the overwhelming- No, no, no. I'm sorry. I may not have been clear. When we're analyzing harmlessness, and again, assuming there's an error, do we delete the testimony of Mr. Santos that would have been hypothetically violative? Or do we imagine for ourselves what the cross-examination would have been and say, well, even if the Croatian guy had been here, the cross-examination wouldn't have done anything? And I don't think we do the latter, but I'm just giving you an opportunity to correct me if I'm getting it wrong. I appreciate Your Honor's question. I don't have any case law that comes to mind to the contrary. Okay. I'm sorry. I didn't get your answer. I don't have any case law that comes to mind to the contrary. But we usually just exclude whatever it is was erroneously admitted. We usually just exclude that and look at the rest of the evidence, isn't that what we normally do? There's no case law that suggests we would imagine a cross-examination of how that would have played out. We just say, would it have affected the jury's verdict? I believe that's right, Your Honor. If Your Honors have no further questions, I rest on the remainder of our briefs. Thank you. All right, Mr. Rabadi, you have one minute. Thank you, Your Honors. On the hearsay statements, I want to be very specific about the hearsay statements that were admitted. They are detailed at page 23 of our reply brief. Santos said that Bachmas said the Croatian National Police conducted the extractions, that he used the Cellbrite software for the extractions, the date and time he said he conducted them, the IMEI numbers he said he recovered, the profile he said he used, the type of cable he said he used, the different types of extractions he said he used, and he said that he did a lot of- Was that based upon something that the Croatian police officer generated or just based upon the review- It's based, if you look at the first two pages of each of these reports, all of this information is in the summary section of those reports. And those are based on Bachmas' statements about what he did. Those are hearsay, and we had the right to cross-examine him about that process. So those things are not generated by the report itself? Based on Santos' testimony describing how this process works, Bachmas had to select all of these things in Cellbrite and make the determination about- I understand he had to select them, but my question to you is, once he selects them, the program itself shows what was selected. There wasn't some independent report generated by the police officer who said, I selected these things, right? Those conclusions that Santos reached were based upon the program itself. What the program showed was selected. There are different types of extractions that can be run. There are different types of profiles that can be selected. Him selecting that information within the Cellbrite and taking the action and deciding what to do, that is a hearsay statement under the federal rules. Taking a human action like that and determining what process to conduct is something that we are entitled to cross-examine him about if it's offered for the truth. Can I ask- Are you suggesting to us that the report itself- you obviously can't cross-examine the report itself, but the report itself generated inaccurate or unreliable information? I mean, it's a pretty standard tool in Cellbrite. Your Honor, the case law is clear that even if it's a very reliable process, we have the right to cross-examine him about the process. For all we know- Your own cross-examination would be against the Cellbrite report, which couldn't really answer any of your questions. Your Honor, for all we know, Bachmott's entirely made this report up. He fabricated it out of whole cloth. We have no way of knowing whether or not this entire report was false because we didn't have the opportunity to question him about that. Can I ask you, hypothetically, how does this situation differ from the following? The Croatian police go in and do a search of the plane, as we know they did, and they seize a kilo of cocaine. They seize, I don't know, a whole box full of documents. Let's say there were, you know, photocopies of driver's licenses and pilot's licenses that belonged to Mr. Adamov, and all these boxes come back. And in lieu of bringing the Croatian National Police to testify in court and to say, I searched the plane and here they are, the government just introduces them and offers circumstantial evidence to suggest that they were actually found in the plane. How is it different? It's the exact same, Your Honor. It's the exact same? Well, what if they don't actually introduce any statements from the Croatian National Police? I mean, wouldn't it then just be a question of authenticity or foundation or something because they're not actually offering a statement from anybody else? I guess what I'm getting to is how much, if at all, is your argument predicated on the admission of the overall report from the examiner, in your case, which contains what appears to be hearsay statements and others which just seem to be stuff found in a place. How much does that differ from the situation where, I don't know, you know, we have stuff found in a place but it's not extracted through a computer program? Yes, Your Honor, and I think that's the difference between the Fifth Circuit's Hill case and the case here. In the Fifth Circuit's Hill case, they were just dealing with the raw data extracted from the phone. That is what was at issue in that case. Here we are talking about a report created by a Croatian examiner that creates his statements about the process. That is the confrontation clause violation. This court is not called upon to decide, in this case, whether or not the government could have just admitted the raw electronic data because that's not what happened here. What happened here is they introduced the statements of the Croatian examiner about the process, and we were entitled to cross-examine him about the process on his competency, his veracity, and his bias. All right, thank you. If there are no further questions, thank you, Your Honor. Mr. Edelstein, you have two minutes. Your Honors, I'd like to address that issue as well, the difference between a report such as this and, quote, stuff found in a place, or as came up earlier, satellite images or billing records. All of those things are things that a jury could understand without help once it's put before them. You don't need an expert to understand what's shown in a photograph of a search or in billing records or in satellite images of a location. In contrast, we cited the case of People v. John. Admittedly, it's a New York Court of Appeals case rather than a circuit case, and in that case it was discussing DNA, but it, you know, used the language, sophisticated software programs that require skilled interpretation from trained analysts. And a celebrity report such as this, I believe it's actually pronounced celebrity, although I could be wrong. No, I think it's called cel-break. Is something that needs to be explained to the jury. I know, but Santos was perfectly situated to do that. He had used that software hundreds of times, right? The limitations of that software, whether that software can be manipulated. It wasn't like they just introduced a report with no witness, right? I mean, in Bolkeming and Melendez-Diaz, the substitute analysts were experts in the processes and the lab techniques. And both of those cases involved putting in a certification and other things that the person had done, including whether they followed certain protocols or not. And we don't have that here. We have just putting a phone up to a computer. There were no protocols. The Croatian police officer had to testify that he followed. There's nothing. So there is no case. There is no case where you've had a machine-generated report where a court has concluded that it creates a confrontation clause. This is the first time that a court has concluded that. Well, Mr. – I think, actually, that it may be an issue that this court should conclude for the first time because AI and increasingly sophisticated computer programs – So if that's someone who does this every day like Mr. Santos, he did 100 of these reports and he dies, your position would be the government can't get any of those reports in. They have to redo them with whatever problems there could be with redoing those reports. That would be your position, right? If that was someone's job to just generate these reports off of phones that were seized every day and they passed away, right? Your Honor, yes, actually. And I believe that the Melendez-Diaz court – Everything is testimonial then, everything that's generated from a machine. If this is testimonial, then anything generated from a machine is testimonial because you couldn't get more basic than this. Agree? No, actually, I wouldn't agree with that. I would agree that this is a program that not only extracts data, but as we discussed in the briefs, it organizes data in the way that prior to this program's existence, an expert would have done. We are seeing more and more AI. We're seeing more and more sophisticated programs. And this could become an issue of whether the government would just, going forward in the future, be able to dodge confrontation by doing everything through AI, implementing programs that do the work of an expert and saying, well, it's just a program. You can't cross-examine the program. All right. Thank you, Your Honor. And if there's nothing further, I'll rest on the briefs. Thank you. Thank you, everyone. Thank you all. Yeah, very helpful. Reserve decision and have a good day. Thank you.